IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: PARK VIEW APT, LLC, | : | Chapter 11 |
| Debtor. | : | Bankr. No. 24-11663-LSS |
| PARK VIEW APT, LLC, | : | |
| Appellants, v. | : | Civ. No. 26-967-GBW |
| AMERICAN FIRST NATIONAL BANK, N.A., | : | |
| Appellee. | : | |

## MEMORANDUM OPINION

## I. INTRODUCTION

Pending before the Court is the emergency motion (D.I. 9) (the "Emergency Motion") filed by chapter 11 debtor Park View Apt, LLC (the "Debtor"), seeking a stay pending its appeal of the Bankruptcy Court's July 22, 2026 order, which mandated turnover by the Debtor of all cash collateral to its senior secured creditor, appellee American First National Bank, N.A. ("American First") by July 27, 2026 (Bankr. D.I. 214)[1] (the "Disbursement Order"). As set forth in the Memorandum Order dated June 9, 2026 (Bankr. D.I. 208) (the "Memorandum Order"), the Bankruptcy Court rejected the Debtor's arguments against turnover, determined that all funds in the Debtor's debtor-in-possession account (the "DIP Account") constitute American First's cash collateral, and ordered those funds must be turned over to American First "immediately, and in any event within three (3) business days." (Memorandum Order at 12; *see* Disbursement Order at 2.)

[1] The docket of the chapter 1 case, captioned *In re Park View Apt, LLC*, No. 24-11663-LSS (Bankr. D. Del.), is cited herein as "Bankr. D.I. __."

On August 4, 2026—two months after the Memorandum Order, two weeks after the Disbursement Order, and a full week after the compliance deadline—the Debtor filed a notice of appeal and sought a stay from the Bankruptcy Court (Bankr. D.I. 222) (the "Bankruptcy Court Stay Motion"), and American First objected (Bankr. D.I. 232) (the "Stay Objection"). On September 16, 2026, American First filed a motion to hold the Debtor and its principals in civil contempt (Bankr. D.I. 242) (the "Contempt Motion"). The Bankruptcy Court entered an order on October 13, 2026 (Bankr. D.I. 251) granting an administrative stay of enforcement of the Disbursement Order for ten days, or through Friday, October 23, 2026. The Debtor waited until 4:00 p.m. on October 23, 2026 to file the Emergency Motion in this Court.

On October 27, 2026, the Court issued an order (1) staying the effect and enforcement of the Disbursement Order briefly and solely for the purpose of considering the relief sought in the Emergency Motion (the "Temporary Stay"), and (2) ordering expedited briefing on the Emergency Motion. (D.I. 10.) The Emergency Motion is fully briefed. (D.I. 9, 11, 12.) For the reasons set forth below, the Emergency Motion will be denied, and the Temporary Stay will be lifted. Debtor shall comply with the Disbursement Order within three (3) business days of the date of this Court's Order.

## II. BACKGROUND

The following factual background appears undisputed. This is a single asset real estate case. (Bankr. D.I. 1 at 2.) The Debtor filed its voluntary chapter 11 petition on August 6, 2024, on the eve of a foreclosure sale of its sole asset—real property located at 719 South Park View Street and 2400 West 7th Street, Los Angeles, California (the "Property"). (*Id.*) American First is the Debtor's senior secured creditor. On January 31, 2019, American First extended a loan to the Debtor in the original principal amount of $9,170,000, secured by a Deed of Trust and Assignment of Rents recorded against the Property. (Declaration of Fivan Tang, Bankr. D.I. 233 (the "Tang Decl.") ¶¶ 7-8.) The loan matured on January 31, 2024, and the Debtor failed to repay it. (*Id.*)

On December 12, 2025, the Debtor and American First entered into a stipulation (Bankr. D.I. 189) (the "Stipulation") resolving the Debtor's objection to American First's claim, which the Bankruptcy Court approved the next day. (Bankr. D.I. 190.) The Debtor recognized that American First held a first-priority secured claim in the allowed amount of $10,400,000, to be paid by 4:00 p.m. (ET) on December 17, 2025, extendable for a fee through December 29, 2025 (the "Payment Deadline"). (Stipulation ¶¶ 1–2.) If the Debtor did not pay, it stipulated that American First holds a valid, perfected first lien on all of its real and personal property under the recorded Deed of Trust and Assignment of Rents, and agreed that neither it "nor any of its principals . . . shall in any way seek to prohibit or frustrate" American First's exercise of its rights in its collateral, "including without limitation foreclosure of the Property." (*Id.* ¶ 5.)

The Debtor did not pay by the Payment Deadline. (Bankr. D.I. 193.) As a result, the Debtor's confirmed plan never became effective, the automatic stay terminated, and American First foreclosed on the Property on February 11, 2026, leaving a deficiency of $5,395,254.49. (Memorandum Order at 4; Tang Decl. ¶ 8.) The day before the sale, the Debtor's sole member and manager, who signed the Stipulation, sued American First in California state court to cancel the foreclosure and quiet title, but failed to obtain an injunction. (Contempt Motion ¶ 15 n.3.)

On April 7, 2026, American First moved to enforce the order approving the Stipulation and compel turnover of the funds in the DIP Account, a Wells Fargo account ending 4475 and the only remaining asset in the estate. (Bankr. D.I. 199.) The Debtor objected, raising the same issues it now raises on appeal, and represented that it "intends to file a complaint . . . to initiate an adversary proceeding." (Bankr. D.I. 203 ¶ 7.) It never did. After full briefing and a hearing on April 23, 2026, at which there was no need for discovery because "there are no facts in dispute" [Memorandum Order at 2 n.6], the Bankruptcy Court granted the motion.

In the Memorandum Order, entered June 9, 2026, the Bankruptcy Court held that "the funds in the DIP Account are cash collateral, and it is undisputed that American First's secured claim has not been paid in full, [so] the funds must be turned over to American First." (Memorandum Order at 12.) It considered and rejected each of the Debtor's arguments, including the need for an adversary proceeding, California Civil Code § 2938, and the nature of the DIP Account funds. (*Id.* at 2 n.6, 6–12.)

On July 22, 2026, the Bankruptcy Court entered the Disbursement Order, directing the Debtor to "immediately, and in any event within three (3) business days of the date of this Order, disburse to American First all funds held in its DIP Account, all of which constitute American First's cash collateral." (Disbursement Order at 2.) American First sent its payment instructions the next day. (Stay Objection, Ex. B.) The deadline to comply was July 27, 2026. The Debtor has transferred no funds to date. (Tang Decl. ¶¶ 10–12.)

Two days after the Disbursement Order, the Debtor's counsel moved to withdraw, citing the Debtor's failure to fulfill its obligations to them. (Bankr. D.I. 215–216.) On August 4, 2026, proposed substitute counsel appeared, and the Debtor filed its notice of appeal and Bankruptcy Court Stay Motion. (Bankr. D.I. 220, 221, 222, 230).

Between July 29 and August 14, 2026, American First demanded in writing five times that the Debtor wire the DIP Account funds as ordered and produce the DIP Account statements for the period after April 30, 2026. (Stay Objection ¶¶ 13, 16–17, 21–22 & Ex. B (Bankr. D.I. 232-2).) The Debtor never wired the funds and did not respond to any demand except one: on August 11, 2026, it produced statements for May, June, and July 2026 and a screenshot of its online account portal. (Stay Objection, Ex. A (Bankr. D.I. 232-1).) The statements show no transactions since April 30, 2026 and $434,677.23 in the account, without accruing interest—contrary to the Debtor's representation to the

Bankruptcy Court that the account bears interest. (*Id.*; Bankruptcy Court Stay Motion ¶ 3; Tang Decl. ¶ 9.)

The Debtor filed its operating reports for February, March, and April 2026 together on July 13, 2026, and has filed none for any later period. (Bankr. D.I. 210–212.)

On September 16, 2026, American First filed the Contempt Motion, seeking to hold the Debtor and its principals, Houshang Neyssani and Hooman Nissani, in civil contempt of the Disbursement Order. The Debtor's objection to that motion does not contend that the Debtor has complied; it argues only that the Debtor sought a stay "within 13 days after the order, under its view of the period for compliance (14 days)." (Bankr. D.I. 258 ¶ 1.)

On October 13, 2026, after a hearing on the Bankruptcy Court Stay Motion, the Bankruptcy Court entered the Stay Order, which provides that "the effect and enforcement of the Court's Disbursement Order dated July 22, 2026 (D.I. 214) is stayed for 10 days after the entry hereof. Such stay expires thereafter." (Stay Order ¶ 2.)

On October 23, 2026, the day that stay expired, the Debtor appealed the Stay Order (Bankr. D.I. 254) and, at 4:00 p.m., filed the Motion, attaching only a proposed order and a certificate of service. [D.I. 9-1, 9-2]. On October 27, 2026, noting that the Debtor had "waited until 4:00 p.m. on October 23, 2026 to seek relief from this Court," this Court entered the Interim Stay Order, staying the Disbursement Order "briefly and solely for the purpose of considering the relief sought in the" Motion.

## III. JURISDICTION AND APPLICABLE STANDARD

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Disbursement Order, which "finally dispose[s] of [a] discrete dispute[] within the larger case," is final and appealable. *In re Energy Future Holdings Corp.*, 904 F.3d 298,

308 (3d Cir. 2018) (quoting *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 n.3 (2006)).

"The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). The Debtor bears the burden of proving that a stay of the Disbursement Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). The "most critical" factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm—the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The Court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) [it] will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a sliding scale approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*In re Revel AC*, 802 F.3d at 571 (emphasis in original) (internal quotations and citations omitted).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

To show that a stay of the Disbursement Order is warranted here, the Debtor must first demonstrate that it has "a reasonable chance, or probability, of winning." *In re Revel AC*, 802 F.3d

at 568. While it is not enough that the chance of success on the merits be better than negligible, the likelihood of winning on appeal need not be more likely than not. *Id.* at 569.

The Debtor reasserts the arguments it presented in the Bankruptcy Court Stay Motion (Bankruptcy Court Stay Motion ¶¶ 24–41), which in turn repeated the arguments the Bankruptcy Court considered and rejected in the Memorandum Order.

First, with respect to the Bankruptcy Court's determination that the funds in the DIP Account are "cash collateral," the Debtor has not made a strong showing that its appeal will disturb that analysis. The Debtor does not deny that American First has an assignment of rents and also perfected its interest in rents prepetition. Nor does it contend that the funds in the DIP Account came from a source other than rents. The Bankruptcy Code expressly defines cash collateral to include

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, *whether existing before or after the commencement of a case under this title.*

11 U.S.C. § 363(a) (emphasis added). The Bankruptcy Court determined that both prepetition and postpetition rents deposited in the DIP Account constitute American First's cash collateral. (Memorandum Order at 9–12.)

Second, the Debtor has not shown it is likely to succeed on its state law arguments. The Debtor relies on *In re GOCO Realty Fund I*, 151 B.R. 241 (Bankr. N.D. Cal. 1993), in support of its argument that under California law a lender is not entitled to rents collected prior to taking an affirmative enforcement step, regardless of whether the assignment is characterized as absolute. The Debtor asserts that California Civil Code § 2938(c) identifies the affirmative steps by which an assignee must enforce its right to collect rents following default, and § 2938(h) addresses competing

assignees and contains a limitation on the right to rents already paid before an enforcement action. This argument is not likely to succeed on appeal, as the Bankruptcy Court carefully distinguished that decision on the critical factual difference that, in *GOCO*, the rents were transferred to third parties prepetition, whereas here the funds at issue remained in the Debtor's own segregated DIP Account. Here, the Debtor "did not use the funds in the ordinary course of business (either prepetition or postpetition) to make payments" to third parties; rather "[t]he collected rents have never left [the Debtor]'s hands" and "sit in [the Debtor]'s (non-commingled) account." (Memorandum Order at 8.) The Debtor's continued reliance on *GOCO* (Emergency Motion ¶ 14) ignores this dispositive distinction, which the Bankruptcy Court addressed in detail. (Memorandum Order at 6–12.)

Third, the Debtor argues that an adversary proceeding was required under Federal Rule of Bankruptcy Procedure 7001 (Emergency Motion ¶ 12). The Debtor has not made a strong showing that it may succeed on this argument. Here, the matter was properly brought as a contested matter seeking enforcement of a stipulated order, and the Debtor effectively sought authority to use American First's cash collateral over its objection. The issues were fully briefed by both parties and argued before the Bankruptcy Court. No factual disputes existed requiring trial, and the Debtor had a full and fair opportunity to present its position. The Bankruptcy Court specifically addressed and rejected this argument, correctly noting that the Debtor was, in essence, seeking permission to use American First's cash collateral to pay administrative claims of the estate. (Memorandum Order at 2 n.6). *See also* Fed. R. Bankr. P. 4001 (contemplating motion practice regarding disputes respecting cash collateral). Indeed, the Debtor itself told the Bankruptcy Court that it "intends to file a complaint . . . to initiate an adversary proceeding as required by Bankruptcy Rule 7001 to properly address the dispute at issue here." (Bankr. D.I. 203 ¶ 7.) It never did.

Fourth and finally, the Debtor's notice argument—which the Debtor itself now describes as "secondary" (Emergency Motion ¶ 15)—is not likely to succeed. The Bankruptcy Court found no

prejudice because the Debtor received notice, had the opportunity to—and did—brief its position, and presented oral argument at the April 23, 2026 hearing, and, in any event, the relevant facts were undisputed. (Memorandum Order at 2 n.6) ("there are no facts in dispute, the matter has been briefed and argued and there are no actual due process concerns"). The Debtor received notice, fully participated in the proceedings, and disputed no facts. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Based on the foregoing, the Debtor falls far short of the required "strong showing that [it] is likely to succeed on the merits" of its appeal. *In re Revel AC*, 802 F.3d at 565.

**B. Irreparable Harm Absent a Stay**

The Debtor argues that, in absence of a stay, "irreparable business harm is cognizable, even though monetary in nature." (D.I. 9 at 8-9.) The Debtor's claimed harm is that the DIP Account funds will be transferred to American First. But this is merely a complaint that, if the Disbursement Order is reversed on appeal after the Debtor has complied with it, American First will owe the Debtor money. *See In re Tribune Co.*, 477 B.R. 465, 476 (Bankr. D. Del. 2012) ("Irreparable harm is an injury that cannot be redressed by a legal or equitable remedy following a trial."). The remedy upon a successful appeal would be a simple order that the bank repay the Debtor—the antithesis of an irreparable injury. The Debtor concedes as much: it acknowledges that "monetary loss for which damages or restitution provide an adequate remedy does not satisfy the irreparable-harm requirement," and it does not contend "that every compelled payment of money is irreparable, or that this case necessarily becomes statutorily moot upon distribution." (Emergency Motion ¶ 16.)

The Debtor advances a theory it did not present to the Bankruptcy Court: that turnover of the DIP Account would "deplete the entirety of Park View's assets" and "destroy any ability to conduct further business or even continue in existence," notwithstanding that the Debtor lost its sole asset to

foreclosure in February 2026. (Emergency Motion ¶ 18; *compare* Bankruptcy Court Stay Motion ¶¶ 42–44.) The Debtor cites several cases in support of its argument that monetary harm may be irreparable when it threatens the existence of the movant's business. Here, the argument is unavailing.

The Debtor "must demonstrate that irreparable injury is *likely* [not merely possible] in the absence of a stay." *In re Revel AC*, 802 F.3d at 569 (alteration in original) (internal quotations marks omitted). A movant seeking a stay must support its claimed harm with evidence. Bankruptcy Rule 8007 requires a motion filed in the district court to include "affidavits or other sworn statements supporting facts subject to dispute" and the "relevant parts of the record." Fed. R. Bankr. P. 8007(b)(3)(B)–(C). The Emergency Motion included no declaration, affidavit, or record excerpt. The Debtor does not even attest to the balance of the DIP Account; it relies on correspondence from American First's counsel and offers that "[t]he most current account balance, the location of the funds, and any intervening account transactions can be established, if deemed necessary." (*See* Emergency Motion ¶ 1.) The Debtor's assertion that turnover would "destroy any ability to conduct further business or even continue in existence" (Emergency Motion ¶ 18) is thus unsupported argument and does not establish irreparable harm.

Moreover, as American First points out, none of the cases on which the Debtor relies found irreparable harm in a compelled transfer of money that can be returned if the appeal succeeds. Each involved an operating business—supported by evidence or uncontested allegations—facing a loss that no later monetary award could repair. Here, by contrast, the Debtor's own operating reports and bank records show no receipts since February 2026, and the Debtor identifies no ongoing business. (Bankr. D.I. 211, 212; Stay Objection ¶ 19 & Ex. A.)[2]

[2] The Debtor cites *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236 (3d Cir. 2011), for the proposition that "even nominally economic harm may be irreparable where the threatened loss is so great that it imperils the business's continued existence." (Emergency Motion ¶¶ 3, 17.) But the district court there "carefully considered and ultimately credited the testimony of several business owners that the new drilling moratorium had dramatically affected their business and would probably

The Emergency Motion argues that turning over the DIP Account funds will "destroy[] their separate nature by commingling these funds ***with the Bank's***" (Emergency Motion ¶ 2 (emphasis added)), and the Debtor's reply asserts the "legal importance of segregation" and its concern that "commingling can necessitate tracing." (*See* D.I. 12 at 4-5.) The Debtor fails to cite any authority addressing facts analogous to this case, however, and it never explains how these concerns are implicated where the Debtor nowhere disputes that American First has an assignment of rents and also perfected its interest in rents prepetition, and where the Debtor nowhere contends that the funds in the DIP Account came from a source other than rents.

Because the Debtor has failed to establish the two "most critical" factors in the stay analysis—that it has a reasonable likelihood of success on the merits or that it would suffer irreparable harm in

---

cause them to shut down or go bankrupt if it continued." 670 F.3d at 255. And the Third Circuit relied on an independent ground—the unique nature of the mineral rights at stake, which, under Pennsylvania's rule of capture, the moratorium caused owners to "lose . . . to other landowners drilling on private lands adjoining" the forest. *Id.* at 256. Here, there is no testimony, no ongoing business identified, and no unique property interest. Cash is fungible, and nothing is lost while the appeal is pending.

The Debtor also relies on *In re Revel AC*, where, the Debtor argues, "the tenant facing the loss of its leasehold would lose its multimillion-dollar investment and its opportunity to operate a previously profitable business." (Emergency Motion ¶ 17; *see id.* ¶ 3.) The tenant there faced extinguishment of its lease through a sale under section 363(f) that section 363(m) would have shielded from appellate reversal, and its only alternative was rejection damages from an insolvent debtor that it contended would be "pennies on the dollar." *See* 802 F.3d at 571–72. The Third Circuit found the exception satisfied because, absent a stay, the tenant would lose "not only its multimillion dollar investment but also the opportunity to operate what was, until the Casino closed, a profitable business." *Id.* at 572. None of those circumstances is present here: the Debtor concedes that statutory mootness is not at issue (Emergency Motion ¶ 16), American First is a solvent national bank, and the Debtor identifies no business to operate.

Finally, the Debtor asserts that the Supreme Court in *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) "treated a substantiated threat of substantial business loss and possible bankruptcy as irreparable." (Emergency Motion ¶ 17.) *Doran* involved bars that sought to enjoin enforcement of a local ordinance banning topless dancing. 422 U.S. at 924–25. The bars "alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy." *Id.* at 932. Reviewing only for abuse of discretion, the Court called the question "a close one." *Id.* Here, American First disputes the claimed harm, the Debtor offers no evidence of it, and the only "loss" is the payment of money that can be restored if the Debtor prevails.

absence of a stay—the Court need not consider the remaining factors. *In re Revel AC,* 802 F.3d at 571 ("if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.") (cleaned up).

## V. CONCLUSION

Based on the foregoing, a stay of the Disbursement Order is not warranted. An appropriate Order follows.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE